**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CHARLES WALKER and EVAN WALKER, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action File No. 1:25-cv-05160-SEG-JHR |
| SOUTHERN MANAGEMENT SYSTEMS, INC.; and | ) | |
| ASSET CAMPUS USA, LLC, | ) | |
| Defendants. | ) | |

**FIRST AMENDED[1] COMPLAINT FOR DAMAGES**

**INTRODUCTION**

1. This action arises from collection and credit reporting activity for an alleged debt that arose out of an apartment lease in Kalamazoo, Michigan, where Plaintiff Evan Walker was a college student and his father Charles Walker was a guarantor on the lease.

2. PLAINTIFFS Charles Walker and Evan Walker (hereinafter individually referred to as "CHARLES" and "EVAN", respectively, and

[1] Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiff sought and obtained written consent, by email though counsel, of all parties who have appeared in this action.

"PLAINTIFFS", collectively), bring this Complaint against Defendant Southern Management Systems, Inc. (hereinafter "SMS") for violations of the Fair Debt Collection Practices Act 15 U.S.C. § 1692 *et seq*. ("FDCPA"), Fair Credit Reporting Act 15 U.S.C. § 1681 *et seq*. ("FCRA"), and the Georgia Fair Business Practices Act O.C.G.A. § 10-1-393 *et seq*. ("GaFBPA").

3. PLAINTIFFS also bring claims against ASSET CAMPUS USA, LLC ("ASSET CAMPUS"), the property management company responsible for the enforcement of the relevant lease, including the charging and collecting rent and fees, for violations of Georgia's Fair Business Practices Act.

## SUBJECT MATTER JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 insofar as Plaintiff's federal claims arise under the laws of the United States.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims because they are so related to claims in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## PARTIES AND PERSONAL JURISDICTION

6. Plaintiff CHARLES currently resides in Cherokee County and is authorized by law to bring this action.

7. Plaintiff EVAN currently resides in Cherokee County and is authorized

by law to bring this action.

8. Defendant SMS is a corporation formed under the laws of the State of Florida and maintains a registered agent in Georgia.

9. SMS has consented to and is subject to the jurisdiction and venue of this Court. *See Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 863 SE2d 81 (2021).

10. SMS was previously served with process in this matter and removed this case to this Court.

11. Moreover, SMS transacts business in this State, and the claims herein arise out of such transactions.

12. Defendant ASSET CAMPUS is a Texas limited liability company and maintains a registered agent in Georgia.

13. ASSET CAMPUS manages and operates the apartment complex in Kalamazoo, Michigan currently known as “The Tate on Howard”, but which was previously known as "700 SOHO."

14. At all times relevant hereto, SMS was acting as an agent of ASSET CAMPUS.

15. ASSET CAMPUS may be served by personal service upon its registered agent in the State of Georgia, to wit: CSC of Stephens County, Inc., 597 Big A Road, Toccoa, GA, 30577.

16. Moreover, ASSET CAMPUS transacts business in this State, and the claims herein arise out of such transactions.

**FACTS COMMON TO ALL DEFENDANTS**

17. On September 6, 2022, EVAN signed a lease (hereinafter the "LEASE") for an apartment unit located at 700 S. Howard Street that he planned to reside in while attending Western Michigan University in Kalamazoo, Michigan. Upon information and belief, EVAN's father, CHARLES, signed a separate document guaranteeing payment for the LEASE.

18. After signing the LEASE, EVAN moved into the apartment and resided there while school was in session during the academic year.

19. Throughout the course of the time EVAN resided at the apartment, the entire complex in which EVAN's unit was located was managed by ASSET CAMPUS.

20. On or about August 7, 2023, while EVAN was staying with his family in Georgia during the summer break, a property manager for the complex and representative of ASSET CAMPUS contacted EVAN in Cherokee County, Georgia to advise him that he was a few days late returning his keys to the leasing office, as the LEASE was supposed to terminate on August 4, 2023.

21. EVAN apologized to the property manager and explained that he believed the LEASE ended on September 1, 2023, as he had signed the LEASE in

September the year before.

22. In light of the misunderstanding, the property manager of ASSET CAMPUS then made a verbal promise to EVAN that ASSET CAMPUS would waive any late fees and charges if EVAN were to come to Kalamazoo right away to remove all his furniture and personal belongings from the apartment, clean it, and return the keys to the leasing office.

23. EVAN immediately dropped everything and made the 794 mile drive from Canton, Georgia to Kalamazoo, Michigan.

24. Approximately 24 hours later, on August 8, 2023, EVAN arrived in Kalamazoo, and he cleaned and removed all his furniture and personal items from the apartment before returning the keys to the leasing office.

25. The next day, despite the property manager's promise, EVAN received an invoice for $6,868.05.

26. Evan was immediately concerned by the excessive amount ASSET CAMPUS was now alleging he owed, which included specific amounts that were supposed to have been waived by the property manager in exchange for him moving out of the apartment promptly.

27. Although EVAN agreed that he owed $583.05 for rent and utilities, the invoice also included $6,285.00 in other fees and charges which were not owed. These charges included a "Holding Fee" (i.e. a holding over fee) and other

"Damages" fees related to cleaning and removing EVAN's personal items from the apartment.

28. These additional charges should not have been included on the invoice, as ASSET CAMPUS' property manager had advised EVAN during their August 7, 2023 telephone phone that those charges would be waived if EVAN removed his belongings promptly.

29. The $1,085 in "Damages" charges for the cleaning and removal of EVAN's personal items and furniture were not owed, as EVAN had personally cleaned and removed all his own furniture and other belongings himself on August 8, 2023.

30. ASSET CAMPUS had also charged him a $5,200.00 "Holding Fee" for the four-day holdover. This "Holding Fee" was ***<u>ten times more</u>*** than the amount EVAN had paid each month in rent.

31. This "Holding Fee" was unsupported by the terms of the LEASE.

32. The LEASE provides the following provision regarding holdovers:

> **3.1** **Holdover.** You or any occupant, invitee, or guest must not hold over beyond the termination date (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, and unless prohibited by law, then (1) holdover rent is due in advance and may become delinquent without notice or demand; ***(2) rent for the holdover period will be increased by 50% over the rental rate set forth in the Lease or any extension, without notice;*** and (3) you'll be liable to us for all damages we incur as a result of our not being able to lease the bedroom to a new resident.

33. The "Holdover Fee" charged was a penalty that had no relation to any actual damages suffered as a result of the four-day holdover.

34. PLAINTIFFS did not owe the $5,200 "Holdover Fee."

35. EVAN immediately called and emailed ASSET CAMPUS to dispute the charges for both the Holdover Fee and the Damages fee and to try and resolve the issue with ASSET CAMPUS directly. Despite his efforts, no representative of ASSET CAMPUS ever responded to EVAN's email or would speak with him over the telephone.

36. ASSET CAMPUS subsequently sent the account to SMS, its agent, for collections and communicated to SMS that EVAN and CHARLES owed ASSET CAMPUS $6,868.05 even though that amount was not owed or even permissible under the terms of the LEASE.

37. ASSET CAMPUS contracted with SMS to collect such sums from PLAINTIFFS in the State of Georgia and to report such sums to credit reporting agencies, including but not limited to Equifax, which is located within the State of Georgia.

38. Approximately eight months later, on or around April 23, 2024, EVAN's father, CHARLES, who was the guarantor on the LEASE, suffered adverse action when he applied for a home equity line of credit.

39. CHARLES learned the sole reason for the adverse action was because

SMS, by and on behalf of ASSET CAMPUS, was reporting a collection tradeline on his credit reports showing that he owed ASSET CAMPUS $6,868.05, which lowered his FICO credit score.

40. Apart from SMS' tradeline, CHARLES' credit history was excellent.

41. EVAN also checked his credit reports and confirmed that SMS, by and on behalf of ASSET CAMPUS, was reporting the same $6,868.05 balance on his credit reports as well.

42. Apart from SMS' tradeline, EVAN'S credit history was also excellent.

43. Around the time of the adverse action, CHARLES spoke to a representative of SMS on the telephone, wherein the representative demanded that CHALRES pay SMS $6,868.05 for the alleged debt to ASSET CAMPUS.

44. CHARLES advised the SMS representative during that telephone call that the amount SMS was attempting to collect on behalf of ASSET CAMPUS was incorrect and that he and EVAN had made multiple attempts to resolve the issue with ASSET CAMPUS directly. CHARLES then requested that SMS send him a debt validation letter so that he could review what SMS alleged he owed, as he had not previously received any collection letter from SMS.

45. SMS then sent CHARLES the requested debt validation letter, which included the same erroneous invoice ASSET CAMPUS had previously sent EVAN in August 2023. The letter also included photos of the apartment dated August 7,

2023 that were taken *before* EVAN drove back up and removed his items, cleaned the apartment, and returned the key on August 8, 2023.

46. On or around May 6, 2024, CHARLES called SMS to attempt to resolve the issue in exchange for payment of the undisputed amount, but was unsuccessful.

47. On or around July 23, 2024, CHARLES and EVAN then disputed the SMS tradeline with the credit reporting agencies, advising that that the amount SMS was trying to collect on behalf of ASSET CAMPUS was not the correct amount owed but was in-fact grossly inflated.

48. In this dispute, CHARLES then once again tried to resolve the matter for $1,103.20, which included $583.05 for the undisputed past-due rent and utilities that EVAN had missed plus $520 (the equivalent of a full month's worth of rent under the LEASE) for the four-day holdover period from August 4th to August 8th. He also specifically requested that SMS remove its tradeline from his credit reports.

49. SMS did not correct its reporting on either CHARLES' or EVAN's credit reports.

50. The only response either CHARLES or EVAN ever received from SMS was a letter SMS sent to EVAN on August 9, 2024 stating that it had reviewed his dispute and found it "lacking in any specific facts or information which would allow us to conduct an investigation."

51. SMS's assertion that no specific facts or information was provided in EVAN's dispute was false, as the letter was sent in response to a detailed, three-page dispute letter both Evan and Charles sent to the CRAs in July of 2024.

52. Still undeterred, both CHARLES and EVAN then continued to send additional dispute letters to the credit reporting agencies regarding SMS' reporting on their credit reports. However, neither SMS nor ASSET CAMPUS would acknowledge the improper accounting, and they refused to correct the amount SMS was reporting to the credit reporting agencies.

53. Frustrated with spending months trying to resolve the issue, PLAINTIFFS sent SMS an ante-litem letter to both its principal place of business and registered agent in Georgia on June 17, 2025.

54. In their ante-litem letter, PLAINTIFFS explained what the issue was and how they wanted SMS to correct the issue.

55. Despite their best efforts to resolve the issue without litigation, neither SMS nor ASSET CAMPUS reached out following the ante-litem letter to try and resolve the dispute prior to filing this instant action.

56. As a result of SMS and ASSET CAMPUS' conduct, both CHARLES and EVAN have suffered significant damages.

## CAUSES OF ACTION

## COUNT ONE: FAIR DEBT COLLECTION PRACTICES ACT (SMS)

57. The acts of SMS constitute violations of the Fair Debt Collection Practices Act (15 U.S.C. §1692 *et seq*.) which include, but are not limited to, the following:

a. Engaging in conduct the natural consequence of which is to harass, oppress or abuse any person, in violation of 15 U.S.C. § 1692d;

b. The use of any false, deceptive, or misleading representations or means in connection with the collection of any debt, in violation of 15 U.S.C. § 1692e;

c. The false representation of the character, amount or legal status of any debt, in violation of 15 U.S.C. § 1692e(2)(A);

d. Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, in violation of 15 U.S.C. § 1692e(8);

e. The use of unfair or unconscionable means to collect or attempt to collect any debt, in violation of 15 U.S.C. § 1692f; and

f. The collection of any amount that is not due per agreement

or law, in violation of 15 U.S.C. § 1692f(1).

58. PLAINTIFFS request actual and statutory damages pursuant to 15 U.S.C. § 1692k(a)(1, 2) and attorney fees pursuant to 15 U.S.C. § 1692k(a)(3).

**COUNT TWO: FAIR CREDIT REPORTING ACT**

**NEGLIGENT NON-COMPLIANCE (SMS)**

59. The FCRA requires a furnisher of information, such as SMS, upon receiving notice of a dispute from a credit reporting agency, to "conduct an investigation with respect to all the disputed information." The furnisher must review all relevant information provided to it by the credit reporting agency as part of the investigation. After conducting its investigation, the furnisher must then inform the credit reporting agency of its results. If the furnisher finds the information is incomplete or inaccurate, or cannot be verified, it must modify, delete, or permanently block the reporting of the disputed information. 15 U.S.C. § 1681s-2(b).

60. The policies and procedures of SMS do not ensure compliance with these furnisher provisions of the FCRA.

61. SMS negligently failed to comply with the furnisher requirements of the FCRA, including 15 U.S.C. § 1681s-2(b).

62. As a result of SMS's failure to comply with the furnisher requirements of the FCRA, PLAINTIFFS have suffered and continue to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with PLAINTIFFS' normal and usual activities for which PLAINTIFFS seek damages in an amount to be determined by the jury pursuant to 15 U.S.C. § 1681o(a)(1).

63. At all times relevant hereto SMS was acting as an agent of ASSET CAMPUS.

64. PLAINTIFFS request attorney fees and costs pursuant to 15 U.S.C. § 1681o(a)(2).

**COUNT THREE: FAIR CREDIT REPORTING ACT**

**WILLFUL NON-COMPLIANCE (SMS)**

65. SMS willfully failed to comply with the furnisher requirements of the FCRA, including 15 U.S.C. § 1681s-2(b).

66. As a result of SMS's willful failure to comply with the furnisher requirements of the FCRA, PLAINTIFFS have suffered and continue to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with PLAINTIFFS' normal and usual activities for which

PLAINTIFFS seek damages in an amount to be determined by the jury pursuant to 15 U.S.C. § 1681n(a)(1).

67. In addition to actual and/or statutory damages, PLAINTIFFS are also entitled to an award of punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. § 1681n(a)(2).

68. At all times relevant hereto SMS was acting as an agent of ASSET CAMPUS.

69. PLAINTIFFS request attorney fees and costs pursuant to 15 U.S.C. § 1681n(a)(3).

## COUNT FOUR: GEORGIA FAIR BUSINESS PRACTICES ACT (SMS and ASSET CAMPUS)

70. The Georgia Fair Business Practices Act prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]" O.C.G.A. § 10-1-393(a).

71. The Georgia Fair Business Practices Act provides that "[i]t is the intent of the General Assembly that this part be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended." O.C.G.A. § 10-1-393(a).

72. The Georgia Court of Appeals has held that such a provision makes the violation of the Fair Debt Collection Practices Act a violation of the Fair Business Practices Act as well. *See* 1st Nationwide Collection Agency v. Werner, 288 Ga.App. 457, 458(1), 654 S.E.2d 428 (2007).

73. Accordingly, SMS' violations of the Fair Debt Collection Practices Act also violates Georgia's Fair Business Practices Act.

74. Moreover, it was an unfair and deceptive act for SMS and ASSET CAMPUS to try to collect an amount from PLAINTIFFS that was not owed.

75. SMS' violations of the Georgia Fair Business Practices Act are intentional.

76. SMS' conduct is the direct and proximate cause of PLAINTIFFS' damages.

77. At all times relevant hereto SMS was acting as an agent of ASSET CAMPUS.

78. ASSET CAMPUS, either directly or indirectly through its authorized collection agent, SMS, engaged in conduct that violated the Georgia Fair Business Practices Act when it charged PLAINTIFFS for damages that were not incurred *plus* almost an entire year's worth of rent for a four-day holdover fee that was not supported by the terms of the LEASE.

79. ASSET CAMPUS had plenty of time to take corrective action after

PLAINTIFFS reached out to advise ASSET CAMPUS that the amount it was charging was inaccurate and unsupported by the LEASE's terms but failed to do so.

80. ASSET CAMPUS had multiple opportunities to instruct their collection agent, SMS, to take corrective credit reporting action after PLAINTIFFS reached out to advise ASSET CAMPUS that the amount it was charging was inaccurate and unsupported by the LEASE's terms but failed to do so.

81. ASSET CAMPUS' violations of the Georgia Fair Business Practices Act were intentional.

82. The conduct of ASSET CAMPUS is the direct and proximate cause of the actual damages sustained by PLAINTIFFS.

83. Defendants are liable to the PLAINTIFFS for the full amount of actual, treble and exemplary damages, along with attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## JURY TRIAL DEMAND

84. PLAINTIFFS demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS RESPECTFULLY PRAY THAT JUDGMENT BE ENTERED AGAINST DEFENDANTS AND IN FAVOR OF THEM, AS FOLLOWS:

1. Statutory damages;

2. General damages to be determined by the jury;

3. Special, or consequential, damages to be determined by the jury;

4. Punitive damages to be determined by jury;

5. Treble and exemplary damages to be determined by jury; and

6. Attorney fees and costs.

Respectfully submitted this 26th day January, 2026.

**SKAAR & FEAGLE, LLP**

by: *_/s/ Chelsea R. Sutton_*
Chelsea R. Sutton
Georgia Bar No. 110863
csutton@skaarandfeagle.com
James M. Feagle
Georgia Bar No. 256916
jfeagle@skaarandfeagle.com
2374 Main Street
Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax

Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
Kris Skaar
Georgia Bar No. 649610
kskaar@skaarandfeagle.com
133 Mirramont Lake Drive
Woodstock, GA 30189
770 / 427-5600
404 / 601-1855 fax

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2026, I served the foregoing PLAINTIFFS' FIRST AMENDED COMPLAINT upon counsel of record via electronic mail.

Respectfully Submitted,

**SKAAR & FEAGLE, LLP**

by: s/ *Chelsea R. Sutton*

Chelsea R. Sutton, Esq.
Georgia Bar No. 110863
csutton@skaarandfeagle.com
2374 Main Street
Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax